


**IT IS ORDERED as set forth below:**

**Date: March 29, 2023**

**Paul Baisier**
**U.S. Bankruptcy Court Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**NEWNAN DIVISION**

| | | |
|---|---|---|
| In re:<br><br>**BENARD QUEEN, JR., and NICHOLE JONES QUEEN,**<br><br>Debtors. | : | CASE NO. **21-11003-PMB**<br><br>CHAPTER 11<br><br>Subchapter V |
| **ROOF TECHNOLOGY PARTNERS, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**BENARD QUEEN, JR., and NICHOLE JONES QUEEN,**<br><br>Defendants. | : | ADVERSARY PROCEEDING<br><br>NO. **22-1005** |

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COUNT I OF PLAINTIFF'S FIRST AMENDED COMPLAINT <u>FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>**

Roof Technology Partners, LLC, the Plaintiff named above (the "Plaintiff"), initiated this Adversary Proceeding (the "Adversary Proceeding") against Defendant-Debtors Benard Queen, Jr. and Nichole Jones Queen (the "Debtors" or "Defendants")[1] through the filing of a three (3) count *Complaint* on May 5, 2022 (Docket No. 1)(the "Original Complaint"). The Original Complaint was amended by the Plaintiff's *First Amended Complaint* filed on June 17, 2022 (Docket No. 5)(the "Amended Complaint").

Before the Court is *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* (the "Motion") and *Brief in Support* (the "Defendants' Brief")(Docket No. 7)(Defendants' Brief, collectively with the Motion, the "Motion to Dismiss"), filed by the Defendants on June 30, 2022. The Motion to Dismiss was filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6), applicable in this case through Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In the Motion to Dismiss, the Defendants seek a dismissal of all counts of the Amended Complaint.[2] This Order addresses the Motion to Dismiss as it relates to Count I of the Amended Complaint. The Motion to Dismiss as it relates to Counts II and III will be addressed by separate Order.

In response to the Motion to Dismiss, the Plaintiff filed its *Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* on July 14, 2022 (Docket No. 8)(the "Response"). In turn,

---

[1] The Debtors commenced this case under Subchapter V of Chapter 11 of title 11, United States Code (the "Bankruptcy Code") by filing a voluntary petition for relief on October 31, 2021 (Main Case Docket No. 1).

[2] The Plaintiff filed the Amended Complaint, along with its initial *Response to Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted* (Docket No. 6), on June 17, 2022, in response to the prior filing of *Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted* on June 3, 2022 (Docket No. 4)(the "First Motion to Dismiss"). The Amended Complaint moots the First Motion to Dismiss.

the Defendants filed their *Reply of Defendants to Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* on July 27, 2022 (Docket No. 10)(the "Reply").

On September 30, 2022, the Court entered its *Order Requiring Supplemental Briefing On 11 U.S.C. § 523(a)(2)(A) Issue* (Docket No. 11)(the "Supplementation Order"), requiring supplemental briefs from the parties on an issue related to Count I of the Amended Complaint. In response to the Supplementation Order, the Defendants filed their *Supplemental Brief Of Defendants In Further Support Of Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 14) on October 21, 2022, and their *Amendment to Supplemental Brief Of Defendants In Further Support Of Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 15)[3] on October 22, 2022 (collectively, the "Defendants' Supplement"). The Plaintiff filed its *Supplemental Brief In Opposition To Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 16)("Plaintiff's Supplement") and its *Motion to Amend First Amended Complaint* (Docket No. 17)(the "Motion to Amend") on November 4, 2022. On November 17, 2022, Defendants filed their *Response of Defendants In Opposition to Plaintiff's Motion to Amend First Amended Complaint* (Docket No. 18)(the "Response to Motion to Amend"). On December 12, 2022, the Plaintiff filed *Plaintiff's Reply Brief in Support of Motion to Amend First Amended Complaint* (Docket No. 20)(the "Amendment Reply").

[3] In the Amendment, the Defendants only do one thing – they add the all-important word "not" to a sentence on Page 4 in the pleading filed the previous day.

## I. Standard of Review for Dismissal[4]

Dismissal of a complaint is appropriate under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." Rule 12(b)(6) is viewed through Rule 8(a), which requires that a pleading set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed.R.Civ.P. 8(a)(2) and Fed.R.Bankr.P. 7008. Under this standard, "to survive a motion to dismiss, a complaint must now contain factual allegations that are 'enough to raise a right to relief above the speculative level.'"[5] In addition, pursuant to Rule 9(b), applicable in this case through Bankruptcy Rule 7009, fraud must be pled with particularity and, although malice and intent may be alleged generally, facts regarding time, place, and content of any alleged misrepresentations must be provided.[6]

In evaluating a motion to dismiss, the inquiry is limited "to the legal feasibility of the complaint and whether it contains facts and not just labels or conclusory statements." *In re Lafayette*, 561 B.R. 917, 922 (Bankr. N.D. Ga. 2016). The Court "must take the factual allegations of the complaint as true and make all reasonable inferences from those facts to determine whether the complaint states a claim that is plausible on its face." *In re American Berber, Inc.*, 625 B.R. 125, 128 (Bankr. N.D. Ga. 2020)(citations omitted); *see also In re Adetayo*,

---

[4] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

[5] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), quoted in *Berry v. Budget Rent A Car Systems, Inc.*, 497 F.Supp.2d 1361, 1364 (S.D. Fla. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

[6] *United States v. Baxter Intern., Inc.*, 345 F.3d 866, 833 (11th Cir. 2003); *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997); *Eden v. Eden (In re Eden)*, 584 B.R. 795, 803-04 (Bankr. N.D. Ga. 2018).

2020 WL 2175659, *1 (Bankr. N.D. Ga. May 5, 2020), citing *Ashcroft, supra*, 556 U.S. at 678, quoting *Twombly, supra*, 550 U.S. at 570. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft*, *supra*, 556 U.S. at 679. A claim has "facial plausibility" when the facts alleged permit a reasonable inference that the defendant is liable on the grounds asserted. *Bank of Am. v. Seligman (In re Seligman)*, 478 B.R. 497, 501 (Bankr. N.D. Ga. 2012)(citations omitted).

In cases "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft, supra*, 556 U.S. at 679, quoting Fed.R.Civ.P. 8(a)(2). In addition, dismissal is proper "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

**II. Factual Allegations**

First Infinity Construction, Inc. ("First Infinity"), an entity owned, operated, and controlled by the Debtors, was the prime contractor under a contract (the "Contract") awarded to it by the United States of America (the "Government") to complete various hanger roofing projects at Fort Stewart, Georgia (collectively, the "Hanger Project"). The original Contract price for the Hangar Project was $2,136,908.58. The Plaintiff entered into a teaming agreement (the "Teaming Agreement") with First Infinity in connection with the Hanger Project, under which the Plaintiff was a subcontractor/supplier. In addition, the Plaintiff in the Teaming Agreement also agreed for a fee (the "Bond Fee") to acquire (and thus be liable on) certain bonds (the "Bonds") First Infinity

needed to move forward on the Hanger Project but could not procure on its own. The Plaintiff contends it provided goods and/or services to First Infinity in the approximate sum of $745,000 under the Teaming Agreement. The Debtors personally guaranteed payment of the sums First Infinity owed to the Plaintiff (the "Guaranty")(Amended Complaint, ¶¶ 8, 10, 15, & 18-20).

To receive progress payments on the Hanger Project under the Contract ("Project Payments"), the Debtors were required to submit certain documents to the Government, including a certification that: (1) amounts requested were based on work properly performed under the Contract, (2) "prior payments received had been utilized to pay the subcontractors and suppliers on the project and that the amounts requested therein would be timely paid to subcontractors…", and (3) the request did not contain amounts to be withheld or retained from a subcontractor or supplier. (Amended Complaint, ¶¶ 22-24). First Infinity received over $2.2 million in Project Payments under the Contract during 2018 and 2019 (Amended Complaint, ¶ 31 and Exhibit "A", *see also* ¶¶ 57-58, & 62).[7]

When the Plaintiff failed to receive full payment for the goods and services it provided on the Hanger Project and inquired about the status of its invoices, the Debtors allegedly misrepresented that First Infinity had not received payment and that First Infinity needed to resubmit its payment requests. Amended Complaint, ¶¶ 33-39. Further, the Debtors allegedly made misrepresentations to the Government regarding their certification that subcontractors were being paid when they were not. Amended Complaint, ¶¶ 45-46. For example, First Infinity used the Project Payments it received on its August 2018 payment request in the amount of $259,881.73

[7] First Infinity allegedly had received the full contract amount of $2,218,485.10 from the Government on the Hanger Project by October 19, 2019. *See* Amended Complaint, ¶ 62.

to pay other debts not related to the Hanger Project, as well to pay as personal expenses of the Debtors, while it continued to misrepresent to the Plaintiff that no payments had been received. (Amended Complaint, ¶¶ 47-54 and Exhibits "B" & "C").

During 2018 and 2019, the Debtors used at least $169,122.40 of the Project Payments received on the Hanger Project intended for the Plaintiff to fund the Debtors' own payroll expense, in addition to causing First Infinity to transfer $429,000 either to the Debtors, members of their family, or for their benefit (Amended Complaint, ¶¶ 66-69 and Exhibit "D")(collectively, the "Personal Expense Transfers").[8] Further, other payments were diverted to pay other vendors on unrelated jobs as well as to pay general operating expenses. Amended Complaint, ¶ 70 (the "Other Transfers"; collectively, with the Personal Expense Transfers, the "Transfers"). Due to this improper diversion of Project Payments from the Plaintiff and other Hangar Project subcontractors, the Plaintiff had to pay the sum of $314,250 to other entities providing goods and services on the Hanger Project because of Plaintiff's liability as indemnitor on the Bonds. Amended Complaint, ¶ 72.

The Plaintiff asserts that had it known First Infinity and the Debtors had been receiving payments from the Government but was using them to pay other expenses, it would have ceased

[8] The Plaintiff states that once it obtains all relevant bank records, it will be able to fully trace amounts received and paid out by the Debtors. Amended Complaint, ¶ 67.

work on the Hanger Project[9] until all Hangar Project subcontractors, including the Plaintiff, were properly paid. The Plaintiff also avers that the Government would have stopped issuing Project Payments if it knew the Debtors' certifications were not truthful. Instead, the Plaintiff relied to its detriment upon the Debtors' misrepresentations and continued to provide goods and services on the Hanger Project. Amended Complaint, ¶ 73.

The Plaintiff eventually filed suit against First Infinity and the Debtors for nonpayment. The matter went to arbitration, where the Plaintiff received an award on a joint and several basis dated August 16, 2021 (the "Award"). The Award was later confirmed and reduced to final judgment in the amount of $1,240,238.13 plus post-judgment interest in the Superior Court of Fulton County, Georgia on October 19, 2021 (the "Debt"). *See Final Judgment and Confirmation of Arbitration Award* (the "Judgment"); Amended Complaint, ¶¶ 74-77.[10] The Plaintiff asserts

[9] It is not possible from the allegations in the Amended Complaint to evaluate the actual likelihood of this result. The Plaintiff alleges in the Amended Complaint that it is the indemnitor on the Bonds but does not describe what type of bonds were obtained. If the Bonds include a completion bond, in which the Plaintiff guaranteed the completion of the Project, it is not likely that the Plaintiff would have ceased work in any circumstance, and in any event, the Plaintiff's damages would not have been reduced by such a cessation – they might instead have been increased. However, because the Amended Complaint does not describe the types of bonds included in the Bonds, the Court assumes for the purposes of the Motion to Dismiss (because that is what was alleged) that the Plaintiff would have ceased work had it known the First Infinity was being paid but was not paying the Plaintiff.

[10] Copies of the Award and the Judgment are not attached to the Motion to Dismiss or to the Amended Complaint. Copies are attached, however, to the Plaintiff's Amended Proof of Claim, Claim No. 20, filed in this case in the amount of $1,262,179.96. On a motion to dismiss, a court is generally limited in its review to what is alleged "'within the four corners of the complaint.'" *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016)(quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n. 7 (11th Cir. 2006)). But "'where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim,'" the documents may be considered in connection with a motion for dismissal under Rule 12(b)(6). *Bickley, supra*, 461 F.3d at 1329 n. 7 (quoting *Brooks v. Blue Cross & Blue Shield, supra,* 116 F.3d at 1369). Here, the Plaintiff refers to the Award and the Judgment in the Amended Complaint (¶ 76), copies of which, as noted, are attached to its Proof of Claim (which is referenced in ¶ 77) and accessible on this Court's public claims docket. The Debtors also refer to the Award and Judgment. Defendants' Brief, p. 8. These documents appear central to the Plaintiff's claim and their authenticity has not otherwise been challenged. Hence, the Court may take judicial notice of the filing of the Award and Judgment and consider them in connection with the Motion to Dismiss without converting the matter to a motion for summary judgment. *See also American Berber, supra*, 625 B.R. at 129. Neither the Award nor the Judgment contain any findings or conclusions on their face. The Award, however, recites that the case was brought "pursuant to two

that the Project Payments received by First Infinity on the Hanger Project constitute contract proceeds that were properly owed to the Plaintiff for services it had performed as well as for amounts invoiced to First Infinity for the Bond Fee.[11] Because the Debtors, as control persons of First Infinity, caused these Project Payments to be misappropriated by means of the Transfers, the Plaintiff asserts that it was harmed and holds an outstanding indebtedness that is subject to exception from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[12]

## III. Discussion

### A. Count I – 11 U.S.C. § 523(a)(2)(A)

In Count I, the Plaintiff alleges that the Debtors' actions as control persons of First Infinity in misappropriating Project Payments received from the Government on the Hanger Project constitute voidable transfers under 11 U.S.C. §§ 548(a)(1)(A) & (B) as well as under O.C.G.A. §§ 18-2-74 & 18-2-75(a). The Debtors allegedly made false representations to the Plaintiff that they would pay the Plaintiff under the Teaming Agreement and for the goods and/or services it provided on the Hanger Project. Once work began, the Debtors made further representations to the Plaintiff on several occasions that the Plaintiff had not been paid because First Infinity was still awaiting payment from the Government when, in fact, it was routinely receiving payments.

contracts," that the Plaintiff herein was entitled to recover "the principal amount" on its claim, and that it was awarded interest and attorneys' fees "as provided in the Contract." Award, pp. 1 & 4.

[11] The Plaintiff states it received $65,051.44 on the Bond Fee it was owed, and $200,000 for its work on the Hanger Project, in partial payments. Excluding the remaining balance of the Bond Fee, which totaled $213,690.86, the amount of approximately $545,000 was never paid to the Plaintiff on its invoices for services as subcontractor/supplier. Amended Complaint, ¶¶ 15 & 64-65.

[12] Count I of the Amended Complaint refers to Section 523(a)(2)(A), Count II refers to Section 523(a)(4), and Count III refers to Section 523(a)(6). As noted above, Counts II and III will be addressed via separate written Order(s).

The Plaintiff contends that these false statements, along with false statements as made to the Government by the Debtors that subcontractors were being paid when they were not, violated Georgia civil and criminal law. Based on its justifiable reliance on these alleged lies and misrepresentations by the Debtors as control persons of First Infinity, the Plaintiff asserts that it suffered an economic loss arising from Debtors' misappropriation of funds including the Transfers, creating an obligation that should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

**1. Standard under 11 U.S.C. § 523(a)(2)(A)**

Based on the presumption under 11 U.S.C. § 727(b) that all debts are dischargeable, a party contending to the contrary under an exception to dischargeability bears the burden of proof and must establish its claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, exceptions to discharge are narrowly construed against the creditor and in favor of the debtor to advance the fresh start policy promoted in the Bankruptcy Code. *See In re Lowery*, 440 B.R. 914, 921 (Bankr. N.D. Ga. 2010)(citing *Hope v. Walker* (*In re Walker*), 48 F.3d 1161, 1164–65 (11th Cir. 1995)); *see also Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

Section 523(a)(2)(A) of the Bankruptcy Code provides that "a discharge under section 727…does not discharge an individual debtor from any debt… (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Here, a debt is excepted from discharge when it occurs "in relation to the commission of 'positive or actual fraud involving moral turpitude or intentional wrongdoing.'" *Invest Atlanta Reg'l Center, LLC v. Smith (In re Smith)*, 578 B.R. 866,

875 (Bankr. N.D. Ga. 2017)(citations omitted). Further, "'legal or constructive fraud, which involves an act contrary to a legal or equitable duty that has a tendency to deceive, yet not originating in an actual deceitful design, is insufficient.'" *Id.* at 876 (citations omitted).

To succeed on a claim under Section 523(a)(2)(A), a creditor must show that the debtor "'obtained money, property or credit from the Plaintiff: (1) by false representation, pretense, or fraud; (2) knowingly made or committed; (3) with the intent to deceive or to induce acting on same; (4) upon which the Plaintiff actually and justifiably relied; and (5) from which the Plaintiff suffered damages, injury or loss as a proximate result.'" *Id.* at 876 (citations omitted). Proof of false representation under Section 523(a)(2)(A) requires "more than an alleged representation by a debtor of an intent to perform a certain action in the future." *Smith*, *supra*, 578 B.R. at 876, citing *Wells Fargo Bank, N.A. v. Farmery (In re Farmery)*, 2014 WL 2986630, *2 (Bankr. N.D. Ga. Apr. 11, 2014)(other citations omitted).

Rather, it must be shown that "at the time when the Debtor entered" into the agreement at issue, here the Teaming Agreement, the Debtors "either knew that [they] lacked the ability" to pay the Plaintiff "or that [they] had no intent" to pay. *See Smith*, *supra*, 578 B.R. at 876, citing *Bropson v. Thomas (In re Thomas)*, 217 B.R. 650, 653 (Bankr. M.D. Fla. 1998); *American Surety & Cas. Co. v. Hutchinson (In re Hutchinson)*, 193 B.R. 61, 65 (Bankr. M.D. Fla.1996). In addition, "an inability to pay in and of itself does not support an inference that the Debtor never intended" to perform. *Smith, supra*, 578 B.R. at 877, citing *Farmery*, *supra*, at *2.

**2. Debtors' Argument for Dismissal**

The Debtors contend that in characterizing their alleged conduct, the Amended Complaint chiefly relies on speculation and conclusory statements. Even as amended, they say, the

Amended Complaint remains deficient in setting forth sufficiently specific allegations of fact to allow a plausible inference that the Debtors engaged in the misconduct asserted in support of a finding of nondischargeability under Section 523(a)(2)(A). The Debtors further argue that the Plaintiff's claim under Count I fails for the following reasons: "(i) the fraudulent transfer statutes relied on by Plaintiff largely do not apply as a matter of law; (ii) Plaintiff has not adequately pled a claim for misrepresentation; and (iii) Plaintiff cannot show its debt was *obtained by* any of the allegedly offensive transfers or misrepresentations." Defendants' Brief, p. 6 (emphasis in original).

First, the Debtors assert that because the fraud exception under Section 523(a)(2) only reaches instances of actual fraud, whereas O.C.G.A. §§ 18-2-74(a)(2) and 18-2-75(a) as well as 11 U.S.C. § 548(a)(1)(B) relate to *constructive* fraud, those sections cannot support the Plaintiff's claim. In any event, the right to pursue fraudulent transfers under Section 548 belongs to the estate for use by the case trustee and not to individual creditors.[13] The Debtors assert that Plaintiff's claim also fails under O.C.G.A. § 18-2-74(a)(1)(transfers made with *actual* intent to hinder, delay, or defraud creditors) because insufficiently specific facts have been alleged in support.

Second, the Debtors urge that the Plaintiff has not offered a properly plausible claim for misrepresentation because the Plaintiff again does not allege specific facts in accordance with Rule 9(b) in this case identifying precisely which statements are at issue, the time, place, and maker of

[13] First Infinity has not filed for relief under the Bankruptcy Code and thus, according to the Debtors, no claim under Section 548 could even be pursued against First Infinity as transferor for the benefit of its bankruptcy estate. Similarly, such a claim could not succeed against the Debtors as transferees of the objectionable transfers on behalf of its estate. *See e.g. Hyman v. Harrold (In re Harrold)*, 296 B.R. 868, 872 (Bankr. M.D. Fla. 2003). As such, even if the Debtors were properly construed to be transferees, the Plaintiff lacks standing to pursue such claims against them.

such statements, their content, and what the Debtors obtained as a result. *See Eden v. Eden (In re Eden)*, 584 B.R. 795, 803-04 (Bankr. N.D. Ga. 2018), quoting *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007); *see also Smith, supra*, 578 B.R. at 877. Even if the Plaintiff's allegations are accepted as true, they add, the debt at issue was not obtained by such purported misrepresentations. Instead, it already existed by virtue of the Contract and Teaming Agreement and the statements that First Infinity was awaiting payment from the Government were in reference to work already completed.[14]

Further, any assertedly false representation made in connection with the Teaming Agreement that First Infinity "will pay" would have addressed future performance. To succeed on that argument, the Plaintiff would need to allege that the Debtors did not intend to pay the Plaintiff at the time of inception, which it has not done. Because the Plaintiff's debt arose by contract or under its bond agreement, and since it cannot arise by alleged post-contract misrepresentations, the Plaintiff has failed to plead sufficient facts to establish a plausible claim that its debt arose from false statements.

Third, the Debtors argue that under the facts alleged, the Plaintiff cannot show its debt was *obtained by* any of the Transfers or misrepresentations alleged in the Amended Complaint as required by 11 U.S.C. § 523(a)(2). *See SE Property Holdings, LLC v. Gaddy (In re Gaddy)*, 977 F.3d 1051, 1056 (11th Cir. 2020), *cert. denied*, _ U.S. _, 141 S.Ct. 2514 (2021); *SE Property Holdings, LLC v. Green (In re Green)*, 968 F.3d 516, 521 (5th Cir. 2020). In *Gaddy, supra*, the Eleventh Circuit reasoned that the determinative issue under Section 523(a)(2)(A) was not whether

[14] The Debtors also assert that the Plaintiff has not specifically alleged how it relied on statements First Infinity or the Debtors made to the Government or to other subcontractors regarding payment.

the debtor had engaged in 'actual fraud' by transferring his assets in the face of a judgment for breach of contract, but instead, whether the underlying debt itself was "obtained by" fraud. Since the debt arose from a breach of contract, Section 523(a)(2)(A) was not satisfied even if the transfers were fraudulent. *Gaddy, supra*, 977 F.3d at 1056-58.[15] Here, the Debtors state, the Plaintiff acknowledges its claim similarly arises from a breach of contract that occurred prior to the allegedly fraudulent conveyance of funds via the Transfers. Thus, even if the Debtors engaged in actual fraud through the Transfers by using payments from the Government to pay other expenses instead of paying the Plaintiff, such conduct did not create the Plaintiff's claim for relief, which was really based on contract. *See also The Piedmont Bank v. Wisner (In re Wisner)*, 608 B.R. 589, 598 (Bankr. N.D. Ga. 2019)(pre-existing contractual debt based on note and personal guaranty not obtained by fraud, was not excepted from discharge even if debtor had intentionally transferred assets to shield them from plaintiff).[16]

**3. Plaintiff's Response in Opposition to Dismissal**

The Plaintiff counters that the facts pled in the Amended Complaint provide adequate notice of its claims and the factual grounds upon which they rest. Further, any perceived lack of specificity of detail in connection with the Transfers can be addressed through further discovery,

---

[15] In its ruling, the court reviewed both *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 136 S.Ct. 1581, 194 L.Ed.2d 655 (2016) and *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000).

[16] *See also Husky, supra.* Distinguishing *Husky,* the court in *Dynomite Mktg., LLC v. Dowd (In re Dowd)*, 616 B.R. 212, 228 (Bankr. N.D. Ga. 2020), concluded that an argument under Section 523(a)(2)(A) failed because the debtor had not yet been found personally liable to the plaintiff. Absent an established claim, the alleged existence of a fraudulent conveyance scheme on its own is insufficient to support a finding of nondischargeability. Further, once an established claim is presented, it must then be shown to have been obtained by the scheme. *See also RES-GA Diamond Meadows, LLC v. Robertson (In re Robertson)*, 576 B.R. 684, 715 (Bankr. N.D. Ga. 2017)(discussing *Husky, supra,* court observes debtor in its case already personally owed debt at issue on an agreement to guarantee and alleged fraudulent transfer scheme occurred thereafter). In the present case, as noted previously, the Debtors were liable under the Guaranty and the Judgment for a debt in contract. *See also Gaddy, supra*, 977 F.3d at 1056.

as such information lies within the control of the Debtors, citing *Sec'y of Labor v. Labbe*, 319 F. App'x 761, 764 (11th Cir. Nov. 4, 2008). *See also Amin v. Mercedes-Benz USA, LLC*, 349 F.Supp.3d 1338, 1350-55 (N.D. Ga. 2018).

Turning to the legal sufficiency of the claim, the Plaintiff contends that the Transfers constitute fraudulent transfers under the state and federal law cited above. Once such a determination is made, the Plaintiff states it can establish a basis for nondischargeability, if its "debt was 'obtained by' the fraudulent conveyance scheme." Response, p. 8, citing *Husky, supra*, 578 U.S. at 366; *Dowd, supra,* 616 B.R. at 228. Here, however, the Plaintiff states it is not asking that the Transfers be avoided. Rather, the Plaintiff seeks a ruling that the debt at issue was incurred through a fraudulent scheme in which the Debtors actively misled the Plaintiff and others about the status of the Project Payments to induce their continued performance on, and the Government's continued funding of, the Hanger Project.

Through this deception, the Debtors wrongfully diverted the Project Payments instead of paying the Plaintiff. Citing *Dowd, supra*, the Plaintiff maintains a nondischargeability claim may proceed even where the claimant holds a judgment debt based on a contract claim and the transfers at issue occurred both prior to and after the time the contract debt arose. 616 B.R. at 217-18, 228. Consistent with the rationale in *Husky, supra*, the Plaintiff insists Section 523(a)(2)(A) applies here because but for the Transfers, which were fraudulent, First Infinity could have paid the Plaintiff and other subcontractors what they were owed.

**B. Analysis**

Reviewing the meaning of the phrase "obtained by…actual fraud" in Section 523(a)(2)(A), the Supreme Court in *Husky* held it "encompass[es] fraudulent conveyance schemes, even when

those schemes do not involve a fraudulent representation." 136 S.Ct. at 1590.[17] In *Husky*, a corporate insider became personally liable under a Texas veil-piercing statute on a debt initially owed to Husky by a corporation that was not the bankruptcy debtor, but whose assets the insider caused to be drained to the detriment of Husky. In *Gaddy*, the Eleventh Circuit rejected a creditor's argument based on its expansive reading of *Husky* that a debtor's post-guaranty transfers rendered a judgment for breach of contract nondischargeable because they were fraudulent. Nothing in *Husky,* the court concluded, supports the idea that a debtor's fraudulent transfer on its own serves to except a breach of contract judgment from discharge under Section 523(a)(2)(A). The debt at issue must have arisen because of fraudulent acts as in *Husky*. *See Gaddy*, *supra*, 977 F.3d at 1057.

By contrast, in *Gaddy*, although the debtor allegedly engaged in actual fraud in conveying personal assets to keep them from the reach of creditors, he was already obligated as a guarantor on the underlying corporate loan that did not itself arise from fraud, and so Section 523(a)(2)(A) did not apply.[18] 977 F.3d at 1058; *see also McClellan, supra*, 217 F.3d at 895; *Wisner, supra*, 608 B.R. at 598 (debtor personally obligated *before* alleged transfers were made). Similarly, in this case, as in *Robertson*, *supra*, the Debtors were already obligated to the Plaintiff under their personal Guaranty, and the Transfers were made after this debt was incurred. There are no

[17] The Court also stated that although a transferor does not obtain a debt in such situation, a transferee with the necessary intent who also acts in fraud may obtain assets through his participation in the scheme. 136 S.Ct. at 1589. The Court did not decide whether the transferor (Ritz) incurred a debt when the transfers were made or whether the debt to Husky was obtained by virtue of the scheme. 136 S.Ct. 1589 n. 3. On remand, the bankruptcy court found the debt nondischargeable relying on Texas fraudulent conveyance and veil-piercing statutes imposing personal liability on Ritz and finding the transfers were done fraudulently. *In re Ritz*, 567 B.R. 715, 724, 737-39, 764 (Bankr. S.D. Tex. 2017).

[18] In *Gaddy*, *supra*, the transfers occurred both before and after the judgment was entered against the corporate borrower and the debtor on his guaranty.

allegations that the Contract, the Teaming Agreement, or the Guaranty were obtained by fraud. Like *Husky*, in this case a corporate non-debtor entity was initially obligated on the debt. Unlike *Husky*, here the Debtors did not become obligated through a piercing of the corporate veil or finding of fraud but were already personally obligated prior to the Transfers under the Guaranty. Moreover, based on the Judgment, they have been found liable for what appears to be a contractual debt with no findings of fraud.

As is evident from the foregoing, in many important ways, this case is just like *Gaddy*. The debtors in both cases had contractual obligations to the creditor that resulted in a judgment. Both before and after the judgment was obtained, the debtor engaged in what the creditor asserts are fraudulent transfers, thereby depleting the estate from which the creditor might otherwise have been paid. The Court in *Gaddy* distinguished *Husky, supra,* and held that the fact that fraudulent transfers had occurred did not convert the dischargeable contract debt into nondischargeable fraud debt. To avoid dismissal of this Count, the Plaintiff must successfully distinguish this case from *Gaddy*. Although its efforts in that regard have been valiant, in the end those efforts have not been successful.

The Plaintiff endeavors to distinguish *Gaddy* in several ways. For example, it says that the debt owed to it – the contract obligation – is different from the debt in *Gaddy* because the debt in *Gaddy* was a loan and was thus incurred all at one time, before any fraud, such that it was wholly contractual. By contrast, the debt owed to it, although incurred under a contract, was incurred over a period of time while it alleges the fraud was ongoing and was only incurred because of the misrepresentations allegedly made by the Debtors to the Government, to the Plaintiff, and to other

subcontractors.[19] There are, however, several difficulties with this framing of the case, as well as with the particular allegations made in the Amended Complaint.

First, and most importantly, there must be a debt for services that were "obtained by" the fraud. *Gaddy, supra*. In that regard, the Plaintiff identifies no specific such debt. In the absence of assistance from the Plaintiff, the only such debt in favor of the Plaintiff that the Court can imagine that might arise from the alleged scheme is either (i) liability related to the fraudulent transfers themselves (with the Debtors as either as maker or recipient) or (ii) the contractual liability, recharacterized in whole or in part as representing "services . . . obtained by . . . actual fraud." *See* 11 U.S.C. § 523(a)(2)(A).

The Plaintiff insists that it is not trying to assert the liability of the Debtors for the fraudulent transfers themselves, and the Court will take it at its word in that regard. Response, pp. 8-9. Even if it were not so generous, however, for the reasons outlined by the Debtors (Reply, p. 4), it does not appear that the Debtors would have any nondischargeable personal liability to the Plaintiff for the fraudulent transfers under Section 523(a)(2)(A) in any event.[20]

---

[19] The Plaintiff does not claim to have relied on false statements allegedly made by the Debtors to the Government stating that the Payment Requests were instead just part of the overall fraudulent scheme (Response, p. 12). The Plaintiff is not entitled to rely on representations made by the Debtors to other subcontractors or to the Government in any event, such that it could not hold a claim that arose from such misrepresentations. *See e.g. In re Vickery*, 488 B.R. 680, 692-93 (B.A.P. 10th Cir. 2013). Further, even if it could rely on them, the allegations regarding the representations alleged to have been made to the subcontractors do not comply with Rule 9. For instance, the Plaintiff fails to identify which subcontractors are alleged to be recipients of misrepresentations, what specific misrepresentations or statements were made to them, who made the alleged misrepresentations, and how it relied upon them. *See Eden*, *supra*, 584 B.R. at 803-804 (citations omitted); *see also* Amended Complaint, ¶¶ 33-62.

[20] In addition, as to amounts transferred from First Infinity to the Debtors, the characterization of those transfers as fraudulent transfers *vis-à-vis* the Plaintiff might be further complicated by the fact that both the transferor and the transferee were already liable to the Plaintiff, making the transfers pointless in terms of evading collection. As to amounts transferred by First Infinity to others, asserting such claims against the transferor (or the Debtors as controlling parties) would appear to constitute impermissible double recovery by the Plaintiff. *See Gaddy*, *supra,* 977 F.3d at 1060; *see also* Defendants' Supplement (Docket No. 14), pp. 3-4.

Although the Plaintiff says that almost its entire Judgment arises from the fraud of the Debtors,[21] it is clear, based on the timing of the provision of services and the making of the alleged misrepresentations that can be derived from the allegations in the Amended Complaint, that a substantial portion of services the charges for which were included in the Judgment were incurred solely based on the Contract, and not as a result of any fraud. More particularly, based on the allegations in the Amended Complaint, much of the work that was done on the Project, both by the Plaintiff and by other subcontractors, was done before the first time that the Plaintiff alleges that the Debtors told it verbally that payment was being held up by the Government, which occurred sometime on or after September 18, 2018.[22]

A review of Exhibit "A" to the Amended Complaint reveals that by September 18, 2018, almost $1.4 million of the $2.2 million contract had already been <u>completed and invoiced to the Government</u>. For the work to have been invoiced to the Government, it would of course first have to have been completed, then invoiced to First Infinity, and then included by First Infinity in an invoice to the Government. This process no doubt would have taken a few weeks if not a few months. With that time delay in mind, and looking further at Exhibit "A," by September 18, 2018, it is likely that more than $1.5 million of the work on the Contract had been completed by that

[21] The Plaintiff acknowledges that the portion of the Judgment that represents the unpaid Bond Fee is a contractual debt (Response, p. 10; Plaintiff's Supplement, p. 7, referring to Amended Complaint, ¶¶ 15-18, & 72), and does not adequately allege that such amount is nondischargeable, as it nowhere asserts that this purely contractual obligation was incurred with no intent to pay it (*see supra*, p. 11), and since it was incurred prior to any of the alleged fraud.

[22] It is actually not clear when the Plaintiff alleges that the first such representation was made, since the Amended Complaint just refers to thirty-three (33) calls between September 18, 2018 and October 31, 2018, saying that "each time Mr. Queen did answer Mr. Coger's calls" during this period, he made the misrepresentation. Amended Complaint, ¶¶ 53-54 (Scott Coger is the Plaintiff's owner). Since Mr. Queen only answered "one of every three" calls, it is not clear when the actual first representation was made. Amended Complaint, ¶ 37. However, as noted *infra*, since these representations were verbal, it is not relevant precisely when it was made.

date,[23] such that the performance of those services would not have been avoided had the Debtors been truthful about the receipt of payments by First Infinity from the Government, and thus they were not procured by fraud. Based on the foregoing analysis of the Amended Complaint, it is clear that, at best, only some portion of the Judgment could have been avoided in the absence of (and thus could be said to have been "obtained by") the alleged fraudulent representations.[24]

The allegations regarding the fraud are deficient in other ways as well. First, they are insufficiently particular, such that they do not comply with Rule 9. Other than with respect to two (2) emails from the Plaintiff to the Debtors (discussed *infra*), the dates of the alleged communications are not provided, nor are any of the particulars of the communications stated beyond conclusory summations. *See* Amended Complaint, ¶¶ 53-54. Under the "heightened" standard of Rule 9, and to satisfy the test in *Iqbal, supra,* and *Twombly*, *supra*, to survive the Motion to Dismiss, the Amended Complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Eden*, *supra*, 584 B.R. at 803-804 (quoting *Tello, supra,* 494 F.3d at 972); *accord Am. Dental*, *supra*, 605 F.3d at 1291. The Plaintiff contends it has met this standard by providing details

[23] By October 3, 2018, over $1.52 million has been billed to the Government per Exhibit "A."

[24] The foregoing analysis assumes without deciding that the Plaintiff has the ability in this context to recharacterize some or all of the Judgment from amounts due under the Contract to amounts owed as a result of the fraudulent statements allegedly made by the Debtors, an ability contested by the Debtors. *See Marvin Nix Dev. Co. v. United Community Bank*, 302 Ga.App. 566, 568, 692 S.E.2d 23 (2010); *see also Gaddy, supra*, 971 F.3d at 1059 (construing Alabama law); *see generally* Defendants' Supplement. To address this issue, the Plaintiff filed the Motion to Amend, in which it seeks to amend the Amended Complaint to assert that it was unaware of the fraud until after it obtained the Judgment, an allegation also contested by the Debtors. The resolution of the Motion to Amend as to Count I is addressed *infra*.

regarding billing procedures, dates and amounts of payments received by First Infinity from the Government, alleged false statements the Debtors made to the Government, and examples of misrepresentations made by phone and email that induced performance by the Plaintiff. Response, pp. 5-7, 11-12.

Yet, these assertions do not show how the Plaintiff relied on statements made to the Government or subcontractors (other than, with respect to the Government, to state certain certifications had to be made before the Government would make payments). Further, although the Plaintiff maintains it was misled by representations regarding the status of payments First Infinity had received, the "detailed specific examples" of such communications allegedly made to both the Plaintiff and subcontractors fail to state the date, time, and (as to the communications with subcontractors) the identity of the subcontractors and what was said to them. *See e.g.* Amended Complaint, ¶¶ 53-54 (phone calls). Although the Plaintiff mentions the possibility of additional discovery in this regard, the detail that is required but is missing should not require any discovery, since the principal of the Plaintiff was a party to all the relevant communications. *See* Amended Complaint, ¶¶ 35-39, 53-55, 60, 66 & Exhibit "D."

Even more problematic for the Plaintiff are the subject of the alleged conversations, and their form. The verbal conversations were allegedly about whether First Infinity had been paid on the Contract, such that it might have the funds to pay the Plaintiff. These communications are remarkably similar to those described in *Lamar, Archer & Cofrin, LLP v. Appling*, _ U.S. _, 138 S.Ct. 1752, 201 L.Ed.2d 102 (2018). In *Appling*, the debtor made misrepresentations to his lawyer about a tax refund – he lied about its size ($100,000 vs. less than $60,000), and whether he had received payment (he had). The Supreme Court found unanimously that such representations

were representations regarding the "financial condition" of the debtor, such that they had to be *in writing* to be actionable under Section 523(a), and then they were only actionable under Section 523(a)(2)(B). *Appling* seems to foreclose the possibility that the Plaintiff can proceed based on the oral representations allegedly made here, which were about a single asset of an insider[25] of the Debtors.

The Plaintiff does allege that similar representations were made in writing on some occasions. However, the Plaintiff only mentions two (2) such misrepresentations specifically – the first in April of 2019 and the second in October of 2019. *See* Amended Complaint, ¶¶ 55-62. Looking again at Exhibit "A," all but the last $94,000 of the work under the Contract had been completed and invoiced by March 21, 2019, and by October of 2019, the entire job was finished. Clearly, the vast majority (if not all) of the services that charges for which were included in the Judgment could not have been obtained through the alleged misrepresentations.

Further, these allegations suffer from the similar infirmities regarding specificity as the purported verbal ones *vis-à-vis* Rule 9. Though the sender and recipient and date are identified, little detail is offered regarding the time of the communications, whether they were part of an email thread or broader context as part of the circumstances surrounding the statements, and specifically how the Plaintiff relied upon them. *See generally Eden*, *supra*, 584 B.R. at 803-804; *see also Rana Fin., LLC v. City Nat'l Bank of New Jersey*, 347 F.Supp.3d 1147, 1155 (S.D. Fla. 2018); *Brooks*, *supra*, 116 F.3d at 1371.

---

[25] The Plaintiff alleges that the Debtors "owned and controlled", and "owned and operated", First Infinity (Amended Complaint, p. 2, ¶ 8), making it an "insider" as to them. *See* 11 U.S.C. §§ 101(2), 101(31)(A)(iv), & 101(31)(E).

Based on the foregoing, the Plaintiffs efforts to distinguish this case from *Gaddy* fail. They fail because, based on the Plaintiff's own allegations, there is simply no obligation of the Debtors (other than the Debt on the Contract evidenced by the Judgment) that the Plaintiff can point to that was obtained by false pretenses, a false representation, or actual fraud. Instead, like the plaintiff in *Gaddy*, the Plaintiff here holds only a judgment based on contractual obligations. The existence of fraudulent transfers in and around the time the incurrence of the contractual debt does not change its nature or create a separate debt that could be nondischargeable.

Further, to the extent that the Plaintiff seeks to convert some portion of the amounts owed under its contract Judgment to amounts due as a result of fraudulent representations made by the Debtors, it has failed to set forth a time line pursuant to which the services it provided or paid for could have been obtained by the alleged misrepresentations, has failed to adequately plead those representations, has inappropriately relied on verbal representations about the financial condition of an affiliate of the Debtors, and thus has inadequately alleged that it holds a debt for services that were "obtained by" the alleged fraud.[26]

Based on the foregoing, the Amended Complaint fails to state a claim for relief under 11 U.S.C. § 523(a)(2)(A), and it is

---

[26] In the Motion to Amend, the Plaintiff seeks to amend the Amended Complaint to add allegations that it did not and could not have known about the fraud until AFTER it obtained the Judgment. The Debtors contest these representations. The purpose of the proposed amendment is to avoid the application of *res judicata* to the Judgment to foreclose the Plaintiff's ability to recharacterize all or some portion of the amounts included in the Judgment as having been obtained by fraud. Because the Court has assumed this ability in its analysis, and also finds other infirmities with the Plaintiff's claims in Count I, the *res judicata* effect of the Judgment has not been relied on in addressing Count I of the Amended Complaint. Because of this reason, and because Count I is otherwise being dismissed, the Motion to Amend is **DENIED as it relates to Count I**.

**ORDERED** that the Motion to Dismiss as to Count I is **GRANTED,** and Count I is **DISMISSED**.

The Clerk is directed to serve a copy of this Order upon the Debtors, counsel for the Debtors, counsel for the Plaintiff, the Subchapter V Trustee, and the United States Trustee.

**[END OF DOCUMENT]**