

**IT IS ORDERED as set forth below:**

**Date: March 31, 2023**

_____

**Paul Baisier**
**U.S. Bankruptcy Court Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | CASE NO. **21-11003-PMB** |
| **BENARD QUEEN, JR.,** | : | |
| **and NICHOLE JONES QUEEN,** | : | CHAPTER 11 |
| | : | |
| Debtors. | : | Subchapter V |
| | : | |
| | : | |
| **ROOF TECHNOLOGY PARTNERS, LLC,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | ADVERSARY PROCEEDING |
| v. | : | |
| | : | NO. **22-1005** |
| **BENARD QUEEN, JR.,** | : | |
| **and NICHOLE JONES QUEEN,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

### ORDER GRANTING DEFENDANTS' MOTION TO
### DISMISS COUNTS II AND III OF PLAINTIFF'S FIRST AMENDED COMPLAINT
### <u>FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED</u>

Roof Technology Partners, LLC, the Plaintiff named above (the "Plaintiff"), initiated this Adversary Proceeding (the "Adversary Proceeding") against Defendant-Debtors Benard Queen, Jr. and Nichole Jones Queen (the "Debtors" or "Defendants")[1] through the filing of a three (3) count *Complaint* on May 5, 2022 (Docket No. 1)(the "Original Complaint"). The Original Complaint was amended by the Plaintiff's *First Amended Complaint* filed on June 17, 2022 (Docket No. 5)(the "Amended Complaint").

Before the Court is *Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* (the "Motion") and *Brief in Support* (the "Defendants' Brief")(Docket No. 7)(Defendants' Brief, collectively with the Motion, the "Motion to Dismiss"), filed by the Defendants on June 30, 2022. The Motion to Dismiss was filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6), applicable in this case through Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In the Motion to Dismiss, the Defendants seek a dismissal of all counts of the Amended Complaint.[2] This Order addresses the Motion to Dismiss as it relates to Counts II and III of the Amended Complaint. The Motion to Dismiss as it relates to Count I was addressed by prior Order entered on March 29, 2023. *See Order Granting Defendants' Motion To Dismiss Count I Of Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 22).

---

[1] The Debtors commenced this case under Subchapter V of Chapter 11 of title 11, United States Code (the "Bankruptcy Code") by filing a voluntary petition for relief on October 31, 2021 (Main Case Docket No. 1).

[2] The Plaintiff filed the Amended Complaint, along with its initial *Response to Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted* (Docket No. 6), on June 17, 2022, in response to the prior filing of *Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted* on June 3, 2022 (Docket No. 4)(the "First Motion to Dismiss"). The Amended Complaint moots the First Motion to Dismiss.

In response to the Motion to Dismiss, the Plaintiff filed its *Brief in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* on July 14, 2022 (Docket No. 8)(the "Response").   In turn, the Defendants filed their *Reply of Defendants to Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint for Failure to State a Claim Upon Which Relief Can Be Granted* on July 27, 2022 (Docket No. 10)(the "Reply").

On September 30, 2022, the Court entered its *Order Requiring Supplemental Briefing On 11 U.S.C. § 523(a)(2)(A) Issue* (Docket No. 11)(the "Supplementation Order"), requiring supplemental briefs from the parties on an issue related to Count I of the Amended Complaint.   In response, the Defendants filed their *Supplemental Brief Of Defendants In Further Support Of Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 14) on October 21, 2022, and their *Amendment to Supplemental Brief Of Defendants In Further Support Of Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 15)[3] on October 22, 2022 (collectively, the "Defendants' Supplement"). The Plaintiff filed its *Supplemental Brief In Opposition To Defendants' Motion To Dismiss Plaintiff's First Amended Complaint For Failure To State A Claim Upon Which Relief Can Be Granted* (Docket No. 16)(the "Plaintiff's Supplement") and its *Motion to Amend First Amended Complaint* (Docket No. 17)(the "Motion to Amend") on November 4, 2022.   On November 17, 2022, Defendants filed their *Response of Defendants In Opposition to Plaintiff's Motion to Amend*

---

[3] In this Amendment, the Defendants only do one thing – they add the all-important word "not" to a sentence on Page 4 in the pleading filed the previous day.

*First Amended Complaint* (Docket No. 18)(the "Response to Motion to Amend").   On December

12, 2022, the Plaintiff filed *Plaintiff's Reply Brief in Support of Motion to Amend First Amended*

*Complaint* (Docket No. 20)(the "Amendment Reply").

## I.   Standard of Review for Dismissal[4]

Dismissal of a complaint is appropriate under Rule 12(b)(6) if it fails "to state a claim upon

which relief can be granted."   Rule 12(b)(6) is viewed through Rule 8(a), which requires that a

pleading set forth a "short and plain statement of the claim showing that the pleader is entitled to

relief."   *See* Fed.R.Civ.P. 8(a)(2) and Fed.R.Bankr.P. 7008.   Under this standard, "to survive a

motion to dismiss, a complaint must now contain factual allegations that are 'enough to raise a

right to relief above the speculative level.'"[5]   In addition, pursuant to Rule 9(b), applicable in this

case through Bankruptcy Rule 7009, fraud must be pled with particularity and, although malice

and intent may be alleged generally, facts regarding time, place, and content of any alleged

misrepresentations must be provided.[6]

In evaluating a motion to dismiss, the inquiry is limited "to the legal feasibility of the

complaint and whether it contains facts and not just labels or conclusory statements."   *In re*

*Lafayette*, 561 B.R. 917, 922 (Bankr. N.D. Ga. 2016).   The Court "must take the factual

---

[4] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).   This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

[5] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), quoted in *Berry v. Budget Relief A Car Systems, Inc.*, 497 F.Supp.2d 1361, 1364 (S.D. Fla. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

[6] *United States v. Baxter Intern., Inc.*, 345 F.3d 866, 833 (11th Cir. 2003); *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997); *Eden v. Eden (In re Eden)*, 584 B.R. 795, 803-04 (Bankr. N.D. Ga. 2018).

allegations of the complaint as true and make all reasonable inferences from those facts to determine whether the complaint states a claim that is plausible on its face*." In re American Berber, Inc.*, 625 B.R. 125, 128 (Bankr. N.D. Ga. 2020)(citations omitted); *see also In re Adetayo*, 2020 WL 2175659, *1 (Bankr. N.D. Ga. May 5, 2020), citing *Ashcroft, supra*, 556 U.S. at 678, quoting *Twombly, supra*, 550 U.S. at 570.   "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."   *Ashcroft, supra*, 556 U.S. at 679.   A claim has "facial plausibility" when the facts alleged permit a reasonable inference that the defendant is liable on the grounds asserted. *Bank of Am. v. Seligman (In re Seligman)*, 478 B.R. 497, 501 (Bankr. N.D. Ga. 2012)(citations omitted).

In cases "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"   *Ashcroft, supra*, 556 U.S. at 679, quoting Fed.R.Civ.P. 8(a)(2).   In addition, dismissal is proper "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."   *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

## II.    Factual Allegations

First Infinity Construction, Inc. ("First Infinity"), an entity owned, operated and controlled by the Debtors, was the prime contractor under a contract (the "Contract") awarded to it by the United States of America (the "Government") to complete various hanger roofing projects at Fort Stewart, Georgia (collectively, the "Hanger Project").   The original Contract price for the Hangar Project was $2,136,908.58.   The Plaintiff entered into a teaming agreement (the "Teaming

Agreement") with First Infinity in connection with the Hanger Project, under which the Plaintiff was a subcontractor/supplier.   In addition, the Plaintiff in the Teaming Agreement also agreed for a fee (the "Bond Fee") to acquire (and thus be liable on) certain bonds (the "Bonds") First Infinity needed to move forward on the Hanger Project but could not procure on its own.   The Plaintiff contends it provided goods and/or services to First Infinity in the approximate sum of $745,000 under the Teaming Agreement.   The Debtors personally guaranteed payment of the sums First Infinity owed to the Plaintiff (the "Guaranty")(Amended Complaint, ¶¶ 8, 10, 15, & 18-20).

To receive progress payments on the Hanger Project under the Contract ("Project Payments"), the Debtors were required to submit certain documents to the Government, including a certification that: (1) amounts requested were based on work properly performed under the Contract; (2) "prior payments received had been utilized to pay the subcontractors and suppliers on the project and that the amounts requested therein would be timely paid to subcontractors…"; and (3) the request did not contain amounts to be withheld or retained from a subcontractor or supplier.   (Amended Complaint, ¶¶ 22-24).   First Infinity received over $2.2 million in Project Payments under the Contract during 2018 and 2019 (Amended Complaint, ¶ 31 and Exhibit "A", *see also* ¶¶ 57-58, & 62).[7]

When the Plaintiff failed to receive full payment for the goods and services it provided on the Hanger Project and inquired about the status of its invoices, the Debtors allegedly misrepresented that First Infinity had not received payment and that First Infinity needed to resubmit its payment requests.   (Amended Complaint, ¶¶ 33-39).   Further, the Debtors allegedly

---

[7] First Infinity allegedly had received the full contract amount of $2,218,485.10 from the Government on the Hanger Project by October 19, 2019.   *See* Amended Complaint, ¶ 62.

made misrepresentations to the Government in their certification that subcontractors were being paid when they were not.   (Amended Complaint, ¶¶ 45-46).   For example, First Infinity used the Project Payments it received on its August 2018 payment request in the amount of $259,881.73 to pay other debts not related to the Hanger Project, as well to pay as personal expenses of the Debtors, while it continued to misrepresent to the Plaintiff that no payments had been received. (Amended Complaint, ¶¶ 47-54 and Exhibits "B" & "C").

During 2018 and 2019, the Debtors used at least $169,122.40 of the Project Payments received on the Hanger Project intended for the Plaintiff to fund the Debtors' own payroll expense, in addition to causing First Infinity to transfer $429,000 either to the Debtors, members of their family, or for their benefit (Amended Complaint, ¶¶ 66-69 and Exhibit "D")(collectively, the "Personal Expense Transfers").[8]   Further, other payments were diverted to pay other vendors on unrelated jobs as well as to pay general operating expenses.   Amended Complaint, ¶ 70 (the "Other Transfers"; collectively, with the Personal Expense Transfers, the "Transfers").   Due to this improper diversion of Project Payments from the Plaintiff and other Hangar Project subcontractors, the Plaintiff had to pay the sum of $314,250 to other entities providing goods and services on the Hanger Project because of Plaintiff's liability as indemnitor on the Bonds. Amended Complaint, ¶ 72.

The Plaintiff asserts that had it known First Infinity and the Debtors had been receiving payments from the Government but was using them to pay other expenses, it would have ceased work on the Hanger Project until all Hangar Project subcontractors, including the Plaintiff, were

---

[8] The Plaintiff states that once it obtains all relevant bank records, it will be able to fully trace amounts received and paid out by the Debtors.   Amended Complaint, ¶ 67.

properly paid.   The Plaintiff also avers that the Government would have stopped issuing Project Payments if it knew the Debtors' certifications were not truthful.   Instead, the Plaintiff relied to its detriment upon the Debtors' misrepresentations and continued to provide goods and services on the Hanger Project.   Amended Complaint, ¶ 73.

The Plaintiff eventually filed suit against First Infinity and the Debtors for nonpayment. The matter went to arbitration, where the Plaintiff received an award on a joint and several basis dated August 16, 2021 (the "Award").   The Award was later confirmed and reduced to final judgment in the amount of $1,240,238.13 plus post-judgment interest in the Superior Court of Fulton County, Georgia on October 19, 2021 (the "Debt").   *See Final Judgment and Confirmation of Arbitration Award* (the "Judgment"); Amended Complaint, ¶¶ 74-77.[9]   The Plaintiff asserts that the Project Payments received by First Infinity on the Hanger Project constitute contract proceeds that were properly owed to the Plaintiff for services it had performed as well as for

---

[9] Copies of the Award and the Judgment are not attached to the Motion to Dismiss or to the Amended Complaint. Copies are attached, however, to the Plaintiff's Amended Proof of Claim, Claim No. 20, filed in this case in the amount of $1,262,179.96.   On a motion to dismiss, a court is generally limited in its review to what is alleged "'within the four corners of the complaint.'"   *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. App'x 883, 887 (11th Cir. 2016)(quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n. 7 (11th Cir. 2006)).   But "'where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim,'" the documents may be considered in connection with a motion for dismissal under Rule 12(b)(6).   *Bickley, supra*, 461 F.3d at 1329 n. 7 (quoting *Brooks v. Blue Cross & Blue Shield, supra,* 116 F.3d at 1369).   Here, the Plaintiff refers to the Award and the Judgment in the Amended Complaint (¶ 76), copies of which, as noted, are attached to its Proof of Claim (which is referenced in ¶ 77) and accessible on this Court's public claims docket.   The Debtors also refer to the Award and Judgment.   Debtors' Brief, p. 8.   These documents appear central to the Plaintiff's claim and their authenticity has not otherwise been challenged.   Hence, the Court may take judicial notice of the filing of the Award and Judgment and consider them in connection with the Motion to Dismiss without converting the matter to a motion for summary judgment.   *See also American Berber, supra*, 625 B.R. at 129.   Neither the Award nor the Judgment contain any findings or conclusions on their face.   The Award, however, recites that the case was brought "pursuant to two contracts," that the Plaintiff herein was entitled to recover "the principal amount" on its claim, and that it was awarded interest and attorneys' fees "as provided in the Contract."   Award, pp. 1 & 4.

amounts invoiced to First Infinity for the Bond Fee.[10]    Because the Debtors, as control persons of First Infinity, caused these Project Payments to be misappropriated by means of the Transfers, the Plaintiff asserts that it was harmed and holds an outstanding indebtedness that is subject to exception from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[11]

### III.    Discussion

**A.  Count II – 11 U.S.C. § 523(a)(4)**

**1.  Fraud or Defalcation while Acting in a Fiduciary Capacity**

**a. Standard Under 11 U.S.C. § 523(a)(4)**

Based on the presumption under 11 U.S.C. § 727(b) that all debts are dischargeable, a party contending to the contrary under an exception to dischargeability bears the burden of proof and must establish its claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, exceptions to discharge are narrowly construed against the creditor and in favor of the debtor to advance the fresh start policy promoted in the Bankruptcy Code. *See In re Lowery*, 440 B.R. 914, 921 (Bankr. N.D. Ga. 2010)(citing *Hope v. Walker* (*In re Walker*), 48 F.3d 1161, 1164–65 (11th Cir. 1995)); *see also Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994).

Section 523(a)(4) excepts from discharge any obligation "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny…." The Eleventh Circuit has recently

---

[10] The Plaintiff states it received $65,051.44 on the Bond Fee it was owed, and $200,000 for its work on the Hanger Project, in partial payments. Excluding the remaining balance of the Bond Fee, which totaled $213,690.86, the amount of approximately $545,000 was never paid to the Plaintiff on its invoices for services as subcontractor/supplier. Amended Complaint, ¶¶ 15, 64-65.

[11] Count I refers to Section 523(a)(2)(A), Count II refers to Section 523(a)(4), and Count III refers to Section 523(a)(6). As noted above, the Motion to Dismiss as it pertains to Count I was addressed by separate written Order.

adopted the following three-part test in analyzing whether a debtor is acting in a "fiduciary capacity" as required under this provision in relation to a creditor.

> First, the relationship must have (1) a trustee, who holds (2) an identifiable trust res, for the benefit of (3) an identifiable beneficiary or beneficiaries. Second, the relationship must define sufficient trust-like duties imposed on the trustee with respect to the trust res and beneficiaries to create a "technical" trust, with the strongest indicia of a technical trust being the duty to segregate trust assets and the duty to refrain from using trust assets for a non-trust purpose. Third, the debtor must be acting in a fiduciary capacity before the act of fraud or defalcation creating the debt.

*In re Forrest*, 47 F.4th 1229, 1234 (11th Cir. 2022), *pet. for cert. docketed*, _ U.S. _ (Nov. 30, 2022); *see also White v. White (In re White)*, 550 B.R. 615, 621-22 (Bankr. N.D. Ga. 2016)(citations omitted). The fiduciary relationship required under the federal standard is narrowly construed and "must arise in connection with a technical trust, as opposed to a constructive or resulting trust, with a definite trust res and identified management duties and obligations, which exist apart from any wrongdoing." *Invest Atlanta Reg'l Center, LLC v. Smith*, 578 B.R. 866, 877 (Bankr. N.D. Ga. 2017), citing *In re Watford*, 374 B.R. 184, 189-91 (Bankr. M.D. N.C. 2007); *see also Forrest, supra,* 47 F.4th at 1237-38; *Quaif v. Johnson (In re Quaif)*, 4 F.3d 950, 953 (11th Cir. 1993). Stated differently, the trust relationship must be in place before the act creating liability occurs, as distinguished from a trust that arises from an alleged defalcation as a form of remedy. *See Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006).

Along with a showing of the proper fiduciary relationship, fraud or defalcation must be established. Defalcation has been defined as "an intentional wrong" or "reckless conduct of the kind set forth in the Model Penal Code." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74, 133 S.Ct. 1754, 1759, 185 L.Ed.2d 922 (2013); *see also Invest Atlanta, supra*, 578 B.R. at 877-

78.   Such conduct is 'equivalent to conscious disregard or willful blindness to' "'a substantial and unjustifiable risk' that the conduct will turn out to violate a [previously existing] fiduciary duty" under the required standard.   *Bullock, supra,* 569 U.S. at 274, 133 S.Ct. at 1759-60.   Measured subjectively, the conduct in view is a "gross deviation" from the proper standard of conduct expected in the situation.   *Bullock, supra.*

### b.  Analysis

In Count II, the Plaintiff alleges that the Debtors acted in a fiduciary capacity in relation to the subcontractors on the Hanger Project, engaging in fraudulent and criminal actions by misappropriating the Project Payments to make the Transfers.   Amended Complaint, ¶¶ 96-103. Although the Plaintiff initially urged application of a theory of constructive trust in this instance, it no longer appears to rely on that argument, in recognition of the requirement of an express trust under 11 U.S.C. § 523(a)(4).[12]   Response, p. 14, citing *Fidelity Bank v. Jimenez (In re Jimenez)*, 608 B.R. 322, 327-29 (Bankr. M.D. Ga. 2019).   To the extent that the Plaintiff continues to pursue a claim asserting defalcation in a fiduciary capacity, the Court finds that Plaintiff has not averred sufficiently plausible factual allegations regarding the existence of an express or technical trust or any basis to impose a fiduciary duty on the Debtors.   There are no allegations that such a trust was created by virtue of the Teaming Agreement or Guaranty.   Even if specific trust-like duties were somehow created or imposed, there is no allegation that they existed before the alleged fraud or defalcation through the Transfers.   The absence of a fiduciary duty eliminates the possibility of

---

[12] The Debtors seek dismissal of Count II on grounds that it fails to plead sufficient facts demonstrating that "an express, technical trust created by agreement or statute [existed] *before* the alleged debt to Plaintiff arose… [or] to show its debt arose *as a result of* any alleged *facts* demonstrating fraud or defalcation, as opposed to for some other reason" such as a breach of contract.   Defendants' Brief, p. 12 (emphasis in original).

any obligations from the Debtors to the Plaintiff being nondischargeable as arising from fraud or

defalcation while acting in a fiduciary capacity under Section 523(a)(4).

### 2. Embezzlement

#### a. Standard Under 11 U.S.C. § 523(a)(4)

After acknowledging the inadequacy of its fiduciary defalcation allegations, the Plaintiff

argues in its Response that its Section 523(a)(4) claim should nevertheless remain because it has

also alleged a proper claim for embezzlement under Section 523(a)(4) in Count II. Plaintiff's

Response, pp. 14-ff. [13] Defined by federal law, embezzlement has been held to mean the

"'fraudulent appropriation of property by a person to whom such property has been entrusted, or

into whose hands it has lawfully come.'" *Ideal Dev. Concepts, LLC v. Gross (In re Gross)*, 639

B.R. 255, 260 (Bankr. N.D. Ga. 2022)(citations omitted); *see also Flemm v. Trexler (In re Trexler)*,

2016 WL 236054, at *7 (Bankr. N.D. Ga. Jan. 11, 2016)(citations omitted). The following

elements must be shown to support a claim for embezzlement: "'(i) property owned by another is

rightfully in the possession of the debtor; (ii) the debtor appropriates the property for personal use;

and (iii) the appropriation occurred with fraudulent intent or by deceit.'" *Gross, supra*, quoting

*Hot Shot Kids Inc. v. Pervis (In re Pervis)*, 512 B.R. 348, 382-83 (Bankr. N.D. Ga. 2014); *see also*

*Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir.

1991)(citations omitted).

---

[13] The Plaintiff does not in its Response identify precisely how it has asserted embezzlement in Count II. The Count nowhere uses the term embezzlement, and only one paragraph of it, Paragraph 102, seems to have relevant allegations, all the rest of Count II being very specifically directed at a fiduciary defalcation theory. Embezzlement is, however, specifically mentioned once in Count III (¶ 105). The Debtors assert this "newly-raised" theory should be dismissed without consideration but argue that, in any event, the Plaintiff fails to support it. Defendants' Reply, at p. 10. Despite its late arrival and thin pleading, this theory is nevertheless considered *infra*.

"'An intent to defraud is defined as "an intention to deceive another person, and to induce such other person, in reliance upon such deception to assume, create, transfer, alter or terminate a right, obligation or power with reference to property."'"  *Trexler, supra*, 2016 WL 236054, at *8, quoting *Sandalon v. Cook (In re Cook),* 141 B.R. 777, 781 (Bankr. M.D. Ga. 1992)(citations omitted).   In making this determination, the court should consider all the circumstances and "'[i]t is knowledge that the use is devoid of authorization, scienter for short...that makes the conversion fraudulent and thus embezzlement.'"  *Gross, supra*, 639 B.R. at 260, quoting *Lenox Pines, LLC v. Smith (In re Smith)*, 2021 WL 1234245, *10 (Bankr. N.D. Ga. Mar. 31, 2021).   Concealment may furnish evidence of fraudulent intent, and an intent to repay funds converted is not a defense. *Trexler, supra*, at *8, citing *Cook, supra*, 141 B.R. at 783-84.

### b.  Analysis

Even if the allegations that First Infinity came into possession of the Project Payments and used those funds for purposes other than fully paying the Plaintiff what it owed under the Teaming Agreement are accepted as true, the key question is whether sufficient facts have been alleged to show that the Plaintiff was the *owner* of the Project Payments or even had an identifiable property interest in them.   The Plaintiff argues that following Georgia construction law, the Project Payments constituted property of the subcontractors (including the Plaintiff) until they were paid in full for goods and services they provided to improve the underlying real property on the Hanger Project, relying on *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1009 (5th Cir.

1986).[14]   In *Weben*, the court concluded that the equitable principles underlying the constructive trust fund doctrine cited in *Short & Paulk Supply Co. v. Dykes*, 120 Ga.App. 639, 646-47, 171 S.E.2d 782, 786-88 (1969), *cert. denied* (1970), remained intact after enactment of the Georgia UCC as amended.   794 F.2d at 1009.[15]   The Plaintiff further insists that even though the court in *Doyle Dickerson Co. v. Durden*, 218 Ga. App. 426, 461 S.E.2d 902, *cert. denied* (1995), did not apply this doctrine when a subcontractor could have filed a materialmen's lien but failed to do so, it nevertheless recognized its existence.

Because the Plaintiff could not file a lien on property of the Government as a means for protecting its interests in this case, it asserts that the constructive trust fund theory applies to the Project Payments under Georgia law.   *Watts v. Pride Util. Constr., Inc. (In re Sudco, Inc.)*, 2007 WL 7143065, at *5 (Bankr. N.D. Ga. Sept. 27, 2007), *on reconsideration*, 2008 WL 7842086 (Jan. 18, 2008).[16]   Because government projects cannot be liened, they generally require bonds.   In this case, however, because First Infinity was unable to obtain the necessary bonding, the Plaintiff

---

[14] In *Weben*, the court held neither a general contractor filing bankruptcy, nor its secured lender, had a right to payment from the owner on an amount needed to pay a subcontractor's claim based on the contractual right of the owner to withhold payment from the former and to pay the latter.   The court also affirmed the viability of the constructive trust fund doctrine under Georgia law as set forth in *Cutler-Hammer, Inc. v. Wayne*, 101 F.2d 823, 825 (5th Cir.), *cert. denied*, 307 U.S. 635, 59 S.Ct. 1031, 83 L.Ed.2d 1517 (1939), in support of its decision.   *Weben, supra*, 794 F.2d at 1009.   In *Wayne*, the court held that when "the owner deposits in the bankruptcy court the unexpended balance of the [construction] contract price, he deposits it to the extent necessary to discharge the liens, *not as money of the estate, but as money of the lien claimants."* 101 F.2d at 825, quoted in *Weben*, *supra*, 794 F.2d at 1009 (emphasis in original).

[15] In *Short & Paulk*, *supra*, the court stated that "[if the contractor] received the full contract price for the job he became a trustee of the funds for the purpose of disbursing them properly to those who held valid claims for labor and materials...."   120 Ga.App. at 646-47, 171 S.E.2d at 788.

[16] As mentioned above, although the Plaintiff evidently acknowledges that it has found no case authority for the proposition that the constructive trust fund doctrine (sometimes referred to as a construction trust) creates a trust relationship cognizable under Section 523(a)(4) sufficient to establish a pre-existing fiduciary relationship (Response, p. 14), it contends that, nonetheless, this theory is sufficient to create a property interest for purposes of embezzlement under this provision.

obtained the necessary bonds and became liable to all other subcontractors for unpaid claims. Response, p. 17.   So, rather than being the potential beneficiary of a bond, as would normally have been the case, the Plaintiff agreed (for a substantial fee of 10% of the Contract price) to be responsible to all the other subcontractors on the Hangar Project for nonpayment.   In this situation, the Plaintiff insists Georgia courts would nevertheless act on grounds of equity to provide a constructive trust in Plaintiff's favor.[17]   Arguing by analogy, the Plaintiff further notes Georgia criminal law addresses misappropriation of an owner's payments on a construction project.   *See* O.C.G.A. § 16-8-15 ("Theft by conversion of payments for property improvements").   Although Plaintiff concedes that there is not a parallel civil remedy, it maintains that the alleged commission of a crime satisfies the elements for embezzlement of entrusted funds.

In the Reply, the Debtors insist that, along with pleading insufficient facts to warrant consideration of an embezzlement claim, the Plaintiff lacked a property right in the Project Payments under either federal or Georgia state law.   Moreover, the Debtors insist that the Debt is contractual in nature and does not satisfy 11 U.S.C. § 523(a)(4) as a debt by reason of embezzlement.

Based on the facts alleged, the Court agrees that that the Plaintiff has not averred sufficient facts to establish an ownership interest in the Project Payments adequate for purposes of asserting a plausible claim for embezzlement.   Embezzlement requires that the debtor rightfully come into

---

[17] For instance, "[a] lien against public property is disallowed by law and a lien which is otherwise disallowed by law cannot be imposed by equity.  However, appellee's 'equitable lien' claim does *not* seek to enforce a lien against public property in contravention of law.   Appellee's 'equitable lien' claim seeks to enforce a lien against funds which are being held by appellant, but which belong to the *general contractor.*   Under appellant's contract with the general contractor, '[t]he money *as it becomes due* is charged with a lien as against the [general] contractor, in favor of the subcontractor, materialmen, and laborers.'"   (Emphasis in original.)   *DeKalb Cnty. v. J & A Pipeline Co.*, 263 Ga. 645, 651, 437 S.E.2d 327, 333 (1993), quoting *Rowell v. Harris,* 121 Ga. 239, 240, 48 S.E. 948 (1904).

possession of property of another.   Thus, proper allegations regarding whether the Debtors (or First Infinity as controlled by the Debtors) owned the Project Payments, or whether they were owned by the subcontractors in the Debtors' hands, are essential but absent here.

The Plaintiff makes no allegation regarding the presence of trust language, an ownership interest in favor of subcontractors, or even a security interest[18] based on the relevant documents referenced in the Amended Complaint with respect to the Project Payments.   The Plaintiff does not allege that it held an ownership interest in the Project Payments exclusive to the rights of First Infinity.   Instead, the Plaintiff cites to what amounts to a right of recovery under federal law or Georgia law.   As to its federal law claims, however, the Plaintiff does not allege or cite authority concerning how incomplete or untrue certifications to the Government by First Infinity in connection with the Project Payments somehow supports an ownership claim in its favor in those funds.   Further, the federal Prompt Payment Act (the "PPA") cited by the Plaintiff does not give rise to either a cause of action for breach of contract in favor of subcontractors[19] against a general contractor or a fiduciary duty, and a violation of its provisions does not support a claim under

---

[18] Further, as held in *Jimenez, supra*, a security interest held by a creditor in the debtor's property does not create the necessary ownership interest under this discharge exception.   608 B.R. at 329-30 (citations omitted).

[19] *See also EMTA Insaat Taahhut ve Ticaret A.S. v. Cosmopolitan Inc.*, 2020 WL 6118839, at *7 (D. Md. Oct. 15, 2020)(collecting cases rejecting "the argument that the PPA contains either an explicit or implied private cause of action in favor of subcontractors").   In *Coronation Sheet Metal Co. v. Interchange Bank (In re KI Liquidation, Inc.)*, 2008 WL 5109369, at *5-*6 (D. N.J. Dec. 1, 2008), the court stated that the submission of false certifications would constitute a breach of contract, but would not justify imposition of a constructive trust with regard to progress payments made by the government on an embassy project.   Similarly, a failure to pay subcontractors timely under 31 U.S.C. § 3905(b)(1) would not violate the statute but would be a breach of contract.   *See also Wood Materials LLC v. Berkley Ins. Co.*, 2018 WL 560473, at *5 (E.D. La. Jan. 24, 2018)(dismissing Prompt Payment Act claim under Rule 12(b)(6)).

Section 523(a)(4).   *See Robert Cormack, P.E., Esq. v. Thomas (In re Thomas)*, 255 B.R. 648, 654 (Bankr. D. N.J. 2000)(citing 31 U.S.C. § 3905(b)(1)).[20]

Although the Contract allegedly contained a provision regarding the use of the Project Payments, the Plaintiff has not alleged the Contract by its terms stated that the Project Payments paid to First Infinity were paid for the specific purpose of paying the Plaintiff to the *exclusion* of all other uses, such as paying other business expenses related to the Hanger Project.   *See* Complaint, ¶¶ 22-33.[21]   In any event, assuming, as alleged, that under the Contract, the Project Payments were intended to be paid in relation to work performed by a specific subcontractor, the failure to use those specific proceeds for that purpose may constitute a breach of the Contract.   It does not, however, furnish the basis for finding that the Plaintiff held a property right in those specific monies or imposing a constructive trust upon them under the law.

Similarly, the Plaintiff has not alleged grounds to support imposition of a constructive trust under Georgia law.   Faced with the claim of an unpaid supplier, the court in *Pettigrew v. Southern*

---

[20] This provision states as follows:

> (b) Each construction contract awarded by an agency shall include a clause that requires the prime contractor to include in each subcontract for property or services entered into by the prime contractor and a subcontractor (including a material supplier) for the purpose of performing such construction contract—
>
>> (1) a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance under its subcontract within 7 days *out of such amounts as are paid to the prime contractor by the agency under such contract*….

31 U.S.C. § 3905(b)(1)(emphasis added).   *See also* 31 U.S.C. § 3903(b)(1)(B)(required certification by prime contractor that "payments to subcontractors and suppliers *have been made from previous payments received under the contract*")(emphasis added).

[21] The Plaintiff alleges "each payment made by the U.S. Government was in response to a specific Payment Request submitted by First Infinity and was intended to be payment for work performed on and/or goods provided to a specific property by specific subcontractors related to specific Delivery Order numbers."   Amended Complaint, ¶ 30.

*Aluminum Finishing Co. (In re Amarlite Architectural Prod.),* 178 B.R. 904, 907 (Bankr. N.D. Ga. 1995), noted that the "constructive trust fund doctrine is viable in Georgia, but is available only to protect those persons entitled to file liens under the Georgia materialmen's lien laws…."   Because the supplier did not come within the statute, it could not avail itself of the constructive trust doctrine.   Similarly, the Plaintiff here had no lien rights, and thus could not be the beneficiary of a constructive trust.[22]   In addition, the court held "O.C.G.A. § 16–8–15 is a criminal statute and …[c]onsidered alone, it is insufficient to create a constructive trust."   *Amarlite, supra,* 178 B.R. at 908.[23]

There is no allegation that the Debtors have been charged and convicted under O.C.G.A. § 16-8-15 for theft by conversion of payments for property improvements.   Even if this had occurred, however, a violation of this criminal statute "does not grant its victims an equitable property interest in the fraudulently obtained funds."   *Pioneer Constr., Inc. v. May (In re May),* 518 B.R. 99, 124 (Bankr. S.D. Ga. 2014)(applying 11 U.S.C. § 523(a)(6)), citing *Doyle Dickerson, supra,* 218 Ga.App. at 427, 461 S.E.2d at 903.[24]   Further, "O.C.G.A. § 16–8–15 does not give rise

---

[22] Under *Sudco, supra,* a party to a government project like the Hangar Project, who has no lien rights, might be entitled to a constructive trust on contract proceeds as well, so long as it has a substitute for the lien – rights under a bond.   The Plaintiff here, however, does not allege that it was a beneficiary under the Bonds and, given that it was also the indemnitor on the Bonds, that is highly unlikely.   Further, even if the Plaintiff was a beneficiary under the Bonds, that would not save the Plaintiff here because it is also the indemnitor, vitiating the reasons expressed in *Sudco* for imposing a trust in its favor in the first place.

[23] The court also noted the supplier had offered no evidence of fraud or inequitable conduct to support imposition of such a trust on grounds of equity as a remedial device.

[24] Plaintiff's effort to obtain an equitable remedy may also be precluded by its conduct in this situation.   More specifically, an equitable remedy may not be appropriately available to a party (like the Plaintiff) that knowingly subjected itself to the risk about which it now complains in return for promised compensation of roughly $200,000. In other words, Plaintiff knowingly decided, for compensation, not only not to be a beneficiary of a bond itself but to provide a bond for all the other subcontractors.   The Plaintiff having voluntarily taken that risk for compensation, it is not clear that equity would provide a remedy here.   Further, the Plaintiff having voluntarily assumed this risk, it is not clear that equity would excuse the Plaintiff's failure to assure that it and the other subcontractors were paid by taking more direct control over the payments from the Government to First Infinity by, for example, having them

to a civil cause of action, nor does it create a property right in the allegedly misappropriated funds."

*May*, *supra*, 518 B.R. at 120, citing *Doyle Dickerson, supra,* 218 Ga.App. at 428, 461 S.E.2d 902.

Joining with the bankruptcy court in *Amarlite, supra,* the court in *Doyle Dickerson* further commented as follows:

> In this connection we note that there is nothing in the criminal statute which makes explicit provision for the creation of a property right such as suggested by plaintiff. Nor do we believe such was intended by the opinions in such cases as *Johnson v. State,* 203 Ga. 147, 150–151, 45 S.E.2d 616 [1947] and *Short & Paulk Supply Co. v. Dykes,* 120 Ga.App. 639, 646–647, 171 S.E.2d 782 [1969, cert. denied, 1970] which use the words trust or trustee, but only in describing the criminal offense. Also, the violation of a penal statute does not automatically give rise to a civil cause of action on the part of one who claims to have been injured thereby since reference must be made to the applicable provisions of tort law.  *Rolleston v. Huie,* 198 Ga.App. 49, 50(2), 400 S.E.2d 349 [1990].

*Doyle Dickerson*, *supra*, 218 Ga. App. at 427, 461 S.E.2d at 903.   In that case, the plaintiff had neglected to avail itself of the protections afforded under Georgia lien law.

Because the law does not recognize a property interest of the Plaintiff in the Project Payments received by First Infinity on the allegations presented under either federal or Georgia law, the Plaintiff has failed to state a plausible claim for embezzlement under 11 U.S.C. § 523(a)(4).

---

deposited into an account over which the Plaintiff had withdrawal approval.  *See Davis v. Davis*, 310 Ga. App. 512, 516, 713 S.E.2d 694, 698 (2011)("Furthermore, '[a] court of equity will not act unless it is shown that the party seeking relief has exercised reasonable diligence…'"); *Romar Acceptance Corp. v. Parham*, 213 Ga. 223, 225, 98 S.E.2d 615, 617 (1957)(refusing to prevent a judgment against the plaintiff in error's bondsmen because it would be unjust based on "the well-established principle that 'Neither law nor equity will assist those who neglect to take care of themselves.'")(citations omitted).

### B.  Count III – 11 U.S.C. § 523(a)(6)

#### 1.  Standard Under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge "a debt…for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  Willfulness is established by showing that the debtor acted with actual intent to cause injury, such as an intentional tort, as distinguished from an intentional act that leads to an injury.  *See AgGeorgia Farm Credit, ACA v. Crumley (In re Crumley)*, 2011 WL 7068913, at \*2 - \*3 (Bankr. N.D. Ga. Aug. 10, 2011), citing *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *see also Kane v. Stewart Tilghman Fox & Bianchi PA* (*In re Kane*), 755 F.3d 1285, 1293 (11th Cir.), *cert. denied*, 574 U.S. 1027 (2014)(quoting *Maxfield v. Jennings* (*In re Jennings*), 670 F.3d 1329, 1334 (11th Cir. 2012)).  Conduct exhibiting reckless indifference to the rights of another resulting in injury does not satisfy this standard.  *Crumley, supra; see also Miller v. Held (In re Held)*, 734 F.2d 628, 629 (11th Cir. 1984).  Evidence that the debtor acted with 'substantial certainty' in connection with an injury, however, is sufficient.  *Jennings*, *supra*, 670 F.3d at 1334, quoting *Walker*, supra, 48 F.3d at 1165; *see also Kawaauhau*, *supra*, 523 U.S. at 61-62.

Maliciousness is shown when the conduct at issue was "'wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill will.'"  *Jennings, supra*, 670 F.3d at 1334.  "'[A] showing of a specific intent to harm another is not necessary'" as constructive or implied malice may be sufficient.  *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir. 1989).  In addition, the debt at issue must actually arise from the objectionable conduct.  *SE Property Holdings, LLC v. Gaddy (In re Gaddy),* 977 F.3d 1051, 1058 (11th Cir. 2020); *Dubbeld v. Diget (In re Diget)*, 2021 WL 4484871, at \*11 (Bankr. N.D. Ga. Sept. 30, 2021).

### 2. Analysis

The Debtors assert that Count III does not state a claim for relief under Section 523(a)(6) because the debt in question pre-existed the alleged objectionable conduct and did not result from it, but instead arises from an action on a contract for which the Plaintiff has received a confirmed Judgment. The Debtors further contend that the Plaintiff has not alleged facts showing that it had the subjective motive to cause injury, or knowledge of its certainty to occur, regarding the Plaintiff or its property at the time of each of the Transfers. No property interest or security interest in the accounts receivable of First Infinity has been alleged, nor that the Debtors were obligated to segregate the Project Payments for the exclusive purpose of using them to pay the Plaintiff, such that the Debtors actions invaded a legal right to the Payment Proceeds. Based on the failure to allege facts showing the Debtors intended to harm a property interest of the Plaintiff in specific proceeds through their actions, the Debtors contend Count III is deficient for purposes of Rule 12(b)(6).

The Plaintiff counters that, given the timing of the Project Payments to First Infinity, the Debtors' misrepresentations to the Government that subcontractors had been paid and their false statements to the Plaintiff denying First Infinity had received the Project Payments, accompanied by the diversion of such funds, are sufficient to allege a claim of intentional and malicious conduct by the Debtors through First Infinity certain to cause harm to the Plaintiff and its property interests.[25]

---

[25] The Plaintiff also objects to the Debtors' attempt to introduce disputed facts not in the record that the Transfers were made in exchange for value given or to merely pay other creditors, which amount to defenses to the claim that they were malicious since that requires they be made "without just cause or excuse." Response, p. 18; Defendants' Brief, p. 23. These "facts" are not considered herein.

Although the Debt held by the Plaintiff is based on the Judgment and the Arbitration Award establishing the Debtors' liability on a contract claim, the Plaintiff maintains that it is not the Judgment that it wants declared nondischargeable.  Instead, it is "an amount to be determined at trial" based on the allegations in the Amended Complaint (¶ 108).  Notwithstanding this phrasing of the request for relief, the Plaintiff must assert some "claim" that it wishes to have determined to be nondischargeable. *Gaddy*, *supra,* 977 F.3d at 1058-59.  On review of the Amended Complaint, and in the absence of any assistance from the Plaintiff, the only claims the Court can surmise might exist in favor of the Plaintiff that could be declared to be nondischargeable under 11 U.S.C. § 523(a)(6) are either (1) some part of the Judgment (the contract debt), or (2) a separately identifiable claim based on the Transfers.  Although the Plaintiff appears only to assert the latter, both are analyzed below.

With respect to the contract claim represented by the Debt, the Amended Complaint does not plead sufficient facts to establish a plausible claim under Section 523(a)(6), since the conduct complained of did not give rise to the Debt.  Rather, the Debt was incurred through a breach of contract and, therefore, is not a "debt for" or "as a result of" a willful and malicious injury.  *See Gaddy, supra,* 977 F.3d at 1058-59; *Diget, supra,* 2021 WL 4484871, at *10.

Apart from the Judgment, the only other claim arising from the allegations set forth in Count III of the Amended Complaint that the Court can identify that could be nondischargeable under Section 523(a)(6) is a potential claim arising from the Transfers.[26]  If the Debtors were not

---

[26] The Plaintiff contends that, beyond the Debtors' liability for breach of contract as represented by the Judgment, a large portion of this claim is due to the Debtors' misrepresentations regarding the status of the Project Payments received from the Government and their misappropriation of such funds.  Further, the Debtors' false statements allegedly induced the Plaintiff and other subcontractors to continue providing goods and services on the Hanger Project to their harm.  The alleged claims for fraud were found to be inadequately pled by separate Order (Docket No. 22).  In addition, claims for defalcation and for embezzlement were found deficient *supra*, because, among other

already liable on the Debt, the Debtors could have fraudulent conveyance liability to the Plaintiffs, as holders of the Judgment, either as persons in control of First Infinity who caused it to make the Transfers,[27] or as recipients of the Transfers.[28]  Unfortunately for the Plaintiff, and as outlined in *Gaddy*, *supra*, because the Debtors are already liable to the Plaintiffs on the Judgment, finding additional liability for fraudulent transfers in these circumstances would provide the Plaintiff with an impermissible double recovery.  *See Gaddy, supra,* 977 F.3d at 1059-60; *see also Junior v. Graham*, 313 Ga. 420, 424, 870 S.E.2d 378, 382 (2022)(referencing prohibition of double recovery under Georgia law).

Consequently, the Debtors cannot have fraudulent transfer liability to the Plaintiff. Because the liability of the Debtors on the Debt did not arise from the conduct properly considered under Section 523(a)(6), and because the Plaintiff would not be entitled to a claim for fraudulent transfer against the Debtors arising from the Transfers, and because the Plaintiff has declined to identify any other claims to consider, the Plaintiff has no claim against the Debtors arising from a willful and malicious injury, and thus Count III cannot be sustained.

---

things, there was no express trust governing the Project Payments and the Plaintiff had no claim to the Project Payments themselves.  Finally, to state a claim under Section 523(a)(6) based on a willfully and maliciously committed act of fraud, the debt itself must arise from a willful and malicious injury, and no such claim has been adequately alleged here.

[27] Persons in control of or responsible for an entity making a fraudulent conveyance can be liable for such conveyance based on active participation.  *See e.g. In re Valente*, 2022 WL 2176785, *4 - *6 (B.A.P. 9th Cir. June 16, 2022); *accord In re Red Dot Scenic, Inc.,* 293 B.R. 116, 120-22 (S.D. N.Y. 2003)(comparing liability of principal as beneficiary of fraudulent transfer with liability as initial transferee).

[28] The assertion of the Debtors' liability to the Plaintiff as recipients of some of the Transfers may be complicated by the fact that transferring assets from First Infinity to themselves did not in any way frustrate the Plaintiff's collection efforts, as the Debtors were liable with First Infinity on the Judgment.

In addition, to the extent that the Plaintiff contends that the Debtors' alleged actions in frustrating the exercise of its right to be paid from the Project Payments by means of the Transfers supports a claim for injury separate from the Judgment, that claim also cannot be sustained.  As discussed *infra*, the Plaintiff has not shown through its allegations that it held a property right in the Project Payments that the Debtors injured through the Transfers, or any other basis for injury, other than a breach of contract.

The Plaintiff certainly had a right to be paid and an expectation that it would be paid from the Project Payments based on the Contract and its performance under the Teaming Agreement. Yet, the allegations do not show that it had an ownership or security interest in those funds or a right of action enforceable in bankruptcy.  Even if these funds could be traced as the Plaintiff contends, it has not been alleged that specific funds were otherwise identified and earmarked for purposes of paying the Plaintiff on its claim.   As pointed out by the Debtors, there was no alleged obligation for First Infinity to place those monies in a separate, designated account for Plaintiff's benefit or otherwise set them aside.[29]

The Plaintiff alleges that the Debtors "knew their actions and misappropriation of the [Project Payments] were substantially certain to cause the injury to [the Plaintiff], because it would deplete First Infinity of the funds necessary to make payment to [the Plaintiff] and other subcontractors related to the [Hanger Project]."  Amended Complaint, ¶ 107.  It is implied that the Debtors knew First Infinity would be unable to pay the Plaintiff in full because of the alleged Transfers.   But there are no allegations that the Plaintiff suffered specific injury, that the Debtors

---

[29] As held in *May*, *supra*, 518 B.R. at 124-125, the required violation "of the creditors' legal rights in property" under Section 523(a)(6) is more than a violation of a "mere contractual obligation."

intended or were equally certain would result, other than the consequences of the breach of the Contract based on the Debtors' failure to pay the Plaintiff its rightful portion once First Infinity received the Project Payments.   As the Debtors assert, even if the allegations show they knew First Infinity would be unable to use the Project Payments to pay the Plaintiff by virtue of the Transfers, the Plaintiff alleges no facts showing that it had an exclusive right to their use.   Finally, of course, just such an argument was considered and rejected in *Gaddy*.   *See Gaddy, supra,* 977 F.3d at 1059.[30]

The allegations admittedly tend to show that, beyond the failure to pay over its share of the Project Payments to the Plaintiff, the Debtors through First Infinity acted to divert them to other purposes, personal and otherwise, in violation of its contractual duties.   They also show that the Debtors encouraged the Plaintiff to continue working by misleading it as to the status of the Project Payments.   But exceptions to discharge must be confined to those expressly contained in the Bankruptcy Code.   The Amended Complaint does not state a plausible a legally viable claim for nondischargeability of a debt under 11 U.S.C. § 523(a)(6) because it does not allege a debt arising through commission of "an intentional act the purpose of which [was] to cause injury or was

---

[30] In addition, as noted above, in knowingly and voluntarily assuming the risk of the subcontractors' nonpayment by procuring the Bond on the Hanger Project, the Plaintiff cannot now argue that it suffered a "willful and malicious" injury against its rights through the Debtors' alleged fraudulent misappropriation of the Payment Proceeds.   *See May*, *supra*, 518 B.R. 99 at 125 ("Finally, the Plaintiff's failure to take reasonable steps to protect itself from claims against its payment bond prevents the application of 11 U.S.C. 523(a)(6)," citing *In re Wolfson*, 56 F.3d 52, 55 (11th Cir. 1995), also citing *Bennett v. W. T. Grant Co.*, 481 F.2d 664, 666 (4th Cir. 1973)(such result "flow[s] from principles of equity basic to bankruptcy adjudications")).

substantially certain to cause injury" to the legal rights of the Plaintiff as asserted through actions that were also "wrongful and without just cause."   *Walker, supra*, 48 F.3d at 1165.[31]

### IV.   Conclusion

In light of the foregoing discussion, it is

**ORDERED** that the Motion to Dismiss as to Counts II and III is **GRANTED**, and Counts II and III are hereby **DISMISSED**.   It is further

**ORDERED** that the Motion to Amend is **DENIED**.[32]

The Clerk is directed to serve a copy of this Order upon the Debtors, counsel for the Debtors, counsel for the Plaintiff, the Subchapter V Trustee, and the United States Trustee.

### [END OF DOCUMENT]

---

[31] Even if the Plaintiff alleged a sufficiently plausible claim of malice, Count III would nevertheless fail on grounds of failure to sufficiently allege willfulness.  As discussed above, it must be properly alleged that the Debtors committed the acts in question, making and concealing the Transfers and failing to pay the Plaintiff, with an actual intent to injure the Plaintiff or a property interest of the Plaintiff.

[32] In the Motion to Amend, the Plaintiff seeks to amend the Amended Complaint to add allegations that it did not and could not have known about the fraud until AFTER it obtained the Judgment.  The Debtors contest these representations.  The purpose of the proposed amendment is to avoid the application of *res judicata* to the Judgment to foreclose the Plaintiff's ability to recharacterize all or some portion of the amounts included in the Judgment as having been obtained by fraud.  Because the Court has assumed this ability in its analysis, and further finds other infirmities with the Plaintiff's claims in Counts II and III, the *res judicata* effect of the Judgment has not been relied on in addressing any of the Amended Complaint.   For this reason, and because the Amended Complaint is otherwise being dismissed, the Motion to Amend is **DENIED**.